## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

**JODI BETH SAUNDERS**

      **Plaintiff,**

**v.**                                  **Case No.: 3:12-cv-602**

**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

      **Defendant.**

### PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned recommends that Plaintiff's motion for judgment on the pleadings be denied, the Commissioner's motion for judgment on the

pleadings be granted, and this case be dismissed, with prejudice, and removed from the docket of the Court.

## I.  **Procedural History**

Plaintiff, Jodi Beth Saunders ("Claimant"), filed applications for SSI and DIB on July 24, 2009, alleging a disability onset date of December 1, 2007, (Tr. at 144, 148), due to "nerves, anxiety and bipolar" disorder. (Tr. at 173). Claimant subsequently added back, stomach, and hip pain and migraine headaches to her list of disabling impairments. (Tr. at 192). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 72, 77, 88, 91). Claimant filed a request for an administrative hearing, which was held on March 30, 2011 before the Honorable Andrew J. Chwalibog, Administrative Law Judge ("ALJ"). (Tr. at 36-67). By written decision dated September 20, 2011, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 10-30). The ALJ's decision became the final decision of the Commissioner on December 28, 2011 when the Appeals Council denied Claimant's request for review. (Tr. at 1–3). Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. §405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed memoranda in support of judgment on the pleadings. (ECF Nos. 7, 8, 10, 11). Consequently, the matter is fully briefed and ready for resolution.

## II.  **Claimant's Background**

Claimant was 36 years old at the time she filed her applications for benefits and 38 years old at the time of her administrative hearing. (Tr. at 36, 144). She dropped out of school in the eighth grade and never received a GED. (Tr. at 41). Claimant communicates in English, (Tr. at 172), but testified to having low reading

2

comprehension. (Tr. at 41). Claimant has prior work experience as a cashier in retail sales establishments such as Family Dollar Store. (Tr. at 62).

III.  **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making

this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review." 20 C.F.R. §§ 404.1520a, 416.920a. Consistent with the special technique, the ALJ must first evaluate the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If such impairment exists, the ALJ documents his findings. Next, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in §§ 404.1520a(c), 416.920a(c). After rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and

"none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). If the claimant's impairment is deemed severe, the ALJ compares the medical findings and the rating and degree of functional limitation to the criteria of the most similar listed mental disorder to determine if the severe impairment meets or is equal to the listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). If the ALJ finds that the claimant has a severe mental impairment that neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations specify how the findings and conclusion reached in applying the special technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2), 416.920a(e)(2).

When a claimant is found disabled and there is medical evidence of drug addiction or alcoholism, the ALJ must conduct a further evaluation to "determine whether [the claimant's] drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(a), 416.935(a). The key issue in making this determination is whether the claimant would still be found disabled if she stopped using drugs or alcohol. *Id.* §§ 404.1535(b), 416.935(b). In performing the assessment, the ALJ will "evaluate which of [the claimant's] limitations . . . would remain if [she] stopped using drugs or alcohol and then determine whether any or all of

5

[her] remaining limitations would be disabling." *Id.* §§ 404.1535(b)(2), 416.935(b)(2).  If a claimant's remaining limitations would not be disabling, then her addiction is considered a contributing factor material to the determination of disability, *id.* §§ 404.1535(b)(2)(i), 416.935(b)(2)(i), and the claimant is not considered disabled within the meaning of the Social Security Act. 42 U.S.C. § 423(d)(2)(C). If a claimant's remaining limitations are still disabling, then the claimant is considered "disabled independent of [her] drug addiction or alcoholism and [the ALJ] will find that [the claimant's] drug addiction or alcoholism is not a contributing factor material to the determination of disability." 20 C.F.R. §§ 404.1535(b)(ii), 416.935(b)(ii).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2012. (Tr. at 13, Finding No 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since the time of the alleged onset of disability. (*Id.*, Finding No. 2). At the second step, the ALJ determined that Claimant had the following severe impairments: "depression, anxiety, bipolar disorder, substance abuse, and degenerative disc disease." (Tr. at 13, Finding No. 3). Under the third inquiry, the ALJ determined that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 13-16, Finding No. 4). Accordingly, the ALJ assessed Claimant's RFC, finding that Claimant had:

> the residual functional capacity to perform light work. The claimant can occasionally climb, balance, stoop, kneel, crouch and crawl. The claimant must avoid concentrated exposure to temperature extremes, vibrations, fumes, odors, dust, gasses and pulmonary irritants and even moderate exposure to hazards. The claimant retains the ability to learn and perform simple work like activities in an environment that involves limited contact with others.

(Tr. at 16-21, Finding No. 5).

The ALJ then reviewed Claimant's past work experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 21-23, Finding Nos. 6–10). The ALJ considered that (1) Claimant was unable to perform any past relevant work; (2) she was born in 1973 and was defined as a younger individual, age 18–49, on the alleged disability onset date; (3) she had limited education and could communicate in English; and (4) transferability of job skills was not an issue because Claimant's past relevant work is unskilled. (Tr. at 21-22, Finding Nos. 6–9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ found that there were no jobs existing in significant numbers in the national economy that Claimant could perform. (Tr. at 22, Finding No. 10).

The ALJ next considered whether Claimant's substance use was a contributing factor material to the determination of disability. (Tr. at 23-30, Finding Nos. 11-17). The ALJ found that even if Claimant stopped abusing substances, she would have a severe impairment or combination of impairments, but the combination of impairments would not meet or medically equal any of the impairments contained in the Listing. (Tr. at 23-26, Finding Nos. 11, 12). The ALJ further determined that Claimant's chronic lower back pain was a severe impairment that was not affected by her substance abuse. However, when considering Claimant's mental impairments, the ALJ found that "when the claimant is on psychotropic medication and not abusing drugs and alcohol, the claimant's anxiety, depression and bipolar disorder are non-severe impairments." (Tr. at 23). Based on these findings, the ALJ then determined that absent the limitations caused or exacerbated by Claimant's substance abuse, she would have:

> the residual functional capacity to perform light work. The claimant can occasionally climb, balance, stoop, kneel, crouch and crawl. The claimant must avoid concentrated exposure to temperature extremes, vibrations, fumes, odors, dust, gasses and pulmonary irritants and even moderate exposure to hazards.

(Tr. at 26-29, Finding No. 13). The ALJ indicated that if Claimant stopped abusing substances, she would still be unable to perform past relevant work; however, there would be a significant number of other jobs in the national economy that she could perform. (Tr. at 29-30, Finding Nos. 14, 16). Accordingly, the ALJ determined that Claimant would not be considered disabled absent her substance use; thus, her substance use disorder was a contributing factor material to the determination of disability. (Tr. at 30, Finding No. 17). Therefore, the ALJ found that Claimant was not disabled under the Social Security Act. (*Id.*).

## IV.   Claimant's Challenges to the Commissioner's Decision

Claimant argues that she is entitled to remand because the ALJ failed to fully consider the opinions of psychologist Rachel Arthur, M.A. (ECF No. 10 at 5-6). Claimant argues that the ALJ ignored Ms. Arthur's May 2010 evaluation of Claimant and the ALJ failed to address certain written comments contained in Ms. Arthur's March 2011 mental RFC opinion. (*Id.* at 7-8).

To the contrary, the Commissioner contends that the ALJ did consider Ms. Arthur's opinions, pointing out that the ALJ referred to the May 2010 opinion when discussing Claimant's social functioning and assessing her credibility. (ECF No. 11 at 9-10). Likewise, the Commissioner argues that the ALJ considered Ms. Arthur's March 2011 opinion but accorded little weight to it for good reason. The Commissioner denies that the March 2011 opinion contained any substantive comments and asserts that it lacked supporting psychological findings or useful narrative explanations. (*Id.* at 10).

## V. <u>Relevant Evidence</u>

The undersigned has reviewed the Transcript of Proceedings in its entirety, including all of the medical records, and summarizes below Claimant's medical treatment and evaluations to the extent that they are relevant to the issue in dispute.

### A.     Evaluations of Rachel Arthur, M.A.

On February 6, 2009, psychologist Rachel Arthur, M.A. at Associates in Psychology and Therapy, Inc. completed a psychological evaluation of Claimant, which included a client interview, mental status exam, Beck Depression Inventory-2d Ed. ("BDI-II"), and Beck Anxiety Inventory ("BAI"). (Tr. at 237-40). Claimant reported experiencing increased symptoms of depression which included "lack of interest in things, a poor appetite, difficulty sleeping, loss of energy, feelings of guilt, poor concentration, and irritability," (Tr. at 237-38), and increased symptoms of anxiety which included "excessive anxiety and worry, difficulty controlling her worry, restlessness, feeling keyed up or on edge, mind going blank, muscle tension, and sleep disturbance," as well as frequent panic attacks. (*Id.*). Claimant reported being "afraid of social situations in which she may be judged negatively by others, or do something to embarrass herself" and that she avoids social situations. (Tr. at 238). Claimant reported "no changes" with regard to her Mental Treatment, Substance Abuse, Educational, Employment, Developmental and Social, or Legal Histories or with her Activities of Daily Living. (*Id.*).

In the course of her mental status examination, Ms. Arthur observed that Claimant's mood was somewhat restricted; affect was somewhat restricted; judgment appeared mildly deficient as evidenced by response to simple comprehension questions; and concentration appeared to be moderately deficient compared to the average

9

individual. (Tr. at 238-39). However, Claimant's appearance; attitude; social interaction; speech; orientation; thought process; thought content; perceptual experiences; immediate memory; recent memory; remote memory; and psychomotor activity were all within normal limits or otherwise unremarkable, and Claimant denied any suicidal or homicidal ideations. (*Id.*). On the BDI-II test, Claimant scored 52 on a 63 point scale, which corresponded with the severe range of depression. (Tr. at 239). On the BAI test, Claimant scored 40 on a 63 point scale, which corresponded with the severe range of anxiety. (*Id.*).

Ms. Arthur then provided the following Diagnostic Impression, based upon Claimant's reported problems and history: "Axis I: Major depressive disorder, single episode-moderate; generalized anxiety disorder; social phobia; Axis II: No diagnosis; Axis III: By client report; scoliosis, acid reflux, and cervical cancer; Axis IV: Economic problems; Axis V [GAF Score]: 45." (Tr. at 239-40). Ms. Arthur declined to diagnose Claimant with panic disorder, noting that "although she reports having weekly panic attacks, they appear to only occur when in public and around others and reportedly only last about five minutes." (Tr. at 240). Ms. Arthur further opined that "prognosis is fair, but would possibly improve if appropriate psychological interventions were utilized. She would likely benefit from individual and group psychotherapy." (*Id.*).

On May 20, 2010, Ms. Arthur completed a second Psychological Evaluation of Claimant, which included a client interview, mental status exam, BDI-II test, and BAI test. (Tr. at 241-45). Claimant's chief complaint was that she suffered from anxiety attacks when in a crowd of people, and that her back hurt all the time. (Tr. at 241). She also reported experiencing constant symptoms of depression since 1998; that she had been diagnosed with bipolar disorder, but denied symptoms of mania or hypomania

except for having racing thoughts and angering easily; significant anxiety and worrying which caused her to feel restless yet lack energy, and muscle tension in her shoulders and back. (*Id.*). Claimant also reported having monthly panic attacks lasting around 5 minutes, which only occurred when in public. (*Id.*). Claimant reported receiving mental health counseling, but no past psychiatric hospitalizations (Tr. at 242). Claimant did not report any history of substance abuse or dependence, and she reported "being in trouble with the law one time due to disorderly conduct and resisting arrest," but did not report a prior DUI. (*Id.*).

In the course of her mental status examination, Ms. Arthur observed that Claimant's judgment appeared mildly deficient as evidenced by her responses to simple comprehension questions; her immediate memory was mildly impaired; her recent memory was markedly impaired; her remote memory was moderately deficient, as she had difficulty relating her history; and her concentration appeared to be moderately deficient compared to the average individual. (Tr. at 243). However, Claimant's appearance; attitude; social interaction; speech; mood; affect; orientation; thought process; thought content; perceptual experiences; insight; and psychomotor activity were all within normal limits or otherwise unremarkable, and Claimant denied any suicidal or homicidal ideations. (*Id.*). On the BDI-II, Claimant scored 44 on a 63 point scale, which corresponded with the severe range of depression. (Tr. at 245). On the BAI, Claimant scored 45 on a 63 point scale, which corresponded with the severe range of anxiety. (*Id.*).

Ms. Arthur then provided the following Diagnostic Impression, based upon Claimant's reported problems and history: "Axis I: Major depressive disorder, single episode-mild; generalized anxiety disorder, not otherwise specified; social phobia; Axis

II: No diagnosis; Axis III: By client report; acid reflux, allergies, arthritis, hypertension, migraine headaches, and back pain; Axis IV: Economic problems; Axis V: GAF 49." (Tr. at 243). However, Ms. Arthur observed that "it is important to note that her reports did not match her presentation. Mood was appropriate to situation and affect was broad. Overt symptoms of depression and anxiety weren't observed." (Tr. at 244). Ms. Arthur declined to diagnose Claimant with panic disorder, because "she claims attacks normally last around 5 minutes" and "reports attacks usually only occur when in public." (*Id.*). Ms. Arthur further opined that "prognosis is fair. [Claimant] lacks insight into her emotional problems and a social support system." (*Id.*).

On March 29, 2011, Ms. Arthur completed a Mental Assessment of Ability to Do Work-Related Activities (Mental) based upon her May 2010 evaluation of Claimant. (Tr. at 523-24). With respect to making occupational adjustments, Ms. Arthur opined that Claimant had a good ability to follow work rules; had a fair ability to relate to co-workers, deal with the public, use judgment, interact with supervisors, and function independently; and had a poor/no ability to deal with work stress and maintain attention/concentration. (Tr. at 523). Ms. Arthur noted that Claimant "experiences extreme anxiety in social situations" and "avoids the public as much as possible & exhibits very poor anger control." (*Id.*). With respect to making performance adjustments, Ms. Arthur opined that Claimant had a good ability to understand, remember and carry out simple job instructions; fair ability to understand and remember and carry out detailed, but not complex job instructions; and poor/no ability to understand, remember and carry out complex job instructions, based upon Claimant's "moderate impairment in concentration and marked impairment in recent memory." (Tr. at 524). With respect to making personal-social adjustments, Ms. Arthur

opined that Claimant had unlimited/very good ability to maintain her personal appearance; and fair ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability, based upon observations that Claimant "has very unstable moods and may react with aggression when angered." (*Id.*). Ms. Arthur further emphasized that Claimant has poor verbal skills and very poor frustration tolerance. (*Id.*).

### B.    Mental Health Evaluations by Agency Experts

On April 1, 2008, state psychologist Lisa Tate, MA conducted a Psychological Evaluation of Claimant, which included a client interview and a mental status examination. (Tr. at 257-61). Claimant's chief complaints were of anxiety, and bipolar disorder, which she claimed to have been diagnosed with six months prior. (Tr. at 258). Claimant also reported having a tendency to overreact with anger, having mood swings several times per day, feeling depressed at all times, and having suffering from increased anxiety dating back to 1998. (*Id.*). In the course of reviewing Claimant's medical, substance abuse, mental treatment, educational, vocational, developmental, and legal histories, Claimant told Ms. Tate that she "does not drink alcohol or use illicit drugs" and "denie[d] any history of alcohol/drug abuse, treatment or related arrests." (*Id.*). However, Claimant did report that she was arrested for DUI in 1994 and arrested for "resisting arrest, disorderly conduct and failure to comply" in December 2007. (Tr. at 259). In her mental status examination of Claimant, Ms. Tate observed that Claimant's observed mood was depressed, though she denied suicidal or homicidal ideations; her affect was restricted and tearful; her recent memory was moderately deficient; and her concentration was moderately deficient. (Tr. at 259-60). However, Claimant's thought processes; thought content; perceptual experiences; insight; judgment; immediate

memory; remote memory; and psychomotor behavior were unremarkable. (*Id.*). In her diagnostic impression, Ms. Tate assessed Claimant with "mood disorder, not otherwise specified," and "generalized anxiety disorder with features of social phobia" based on Claimant's report of symptoms experienced. (Tr. at 260). However, Ms. Tate also observed that Claimant's "social functioning was within normal limits," based on her interaction with staff during the evaluation. (*Id.*). Claimant's persistence and pace were also both within normal limits based on clinical observation, although her concentration was moderately deficient. (Tr. at 260-61).

On November 17, 2009, state psychologist Ernie Vecchio, M.A., conducted a Disability Determination Evaluation of Claimant, which included a clinical interview, mental status exam, Wechsler Adult Intelligence Scale-3d Ed., and a Wide Range Achievement Test-3d Ed. (Tr. at 327). Mr. Vecchio noted that "unless otherwise indicated, [Claimant] is the source of the information contained in this report" but that "[s]he is a poor historian." (Tr. at 328). Claimant' chief complaints were of bipolar disorder, which she claimed was first diagnosed three months prior,[1] and anxiety. (*Id.*). Regarding her substance abuse history, Claimant reported that she "was a big drinker but [she] quit in August" of 2009. [2] (Tr. at 329). She reported that she "started drinking at age eleven and quit at thirty-six." (*Id.*). Claimant reported that she "went through a case of beer a day" while she was drinking, and "used to smoke marijuana too but [she] stopped that in August" of 2009 as well. (*Id.*). Regarding her legal history, Claimant reported that she "was arrested once for resisting [arrest]" one year prior, and that she

---

[1] This appears to be in contradiction with the April 1, 2008 evaluation by Lisa Tate, M.A., in which Claimant "report[ed] she was diagnosed with bipolar disorder six months ago." (Tr. at 258).

[2] At the hearing before the ALJ, Claimant provided conflicting testimony, contending that she had not consumed alcohol "for about four years," which would be 2007, rather than 2009. (Tr. at 46).

"was drunk at the time." (*Id.*). Claimant reported spending 10 days in jail, followed by six months of probation. (*Id.*). Claimant also reported being placed "in the Mason county Jail a couple of days for driving with a suspended license in 1999-2000." (*Id.*).

In Claimant's mental status examination, Mr. Vecchio observed that Claimant "present[ed] as a soft-spoken, nervous, submissive, low-functioning middle-aged female" but was otherwise unremarkable in her appearance. (Tr. at 329). Claimant's attitude/behavior was cooperative but apathetic; social interaction was within normal limits though anxious; mood was depressed; affect was flat; thought content was focused on feeling aggravated and depressed all the time; insight was poor; judgment was mildly deficient; recent memory was moderately deficient; remote memory was mildly deficient; and concentration, persistence, and pace, were mildly deficient. (Tr. at 329-330). Claimant's speech; orientation; thought processes; perceptual; immediate memory; and psychomotor behavior were all within normal limits or otherwise unremarkable, and she denied any suicidal or homicidal ideation. (Tr. at 330). On the Wechsler Adult Intelligent Scale-3d Ed., Claimant scored a Verbal IQ of 63, a Performance IQ or 63, and a Full Scale IQ or 60, thereby "placing her cognitive abilities within the Mildly Retarded Range." (Tr. at 332). The results of the Academic Achievement Assessment, suggested that Claimant's functional academic skills were at or between 3.5 and 4.5 grade equivalent, which Mr. Vecchio indicated was comparable to her overall intellectual measure. (*Id.*).

Mr. Vecchio diagnosed Claimant with the following: Axis I: Bipolar I disorder, most recent episode depressed; generalized anxiety disorder; polysubstance dependence (in remission); Axis II: Mild mental retardation; personality disorder NOS; Axis III: None reported. (*Id.*). Mr. Vecchio specified that Claimant's diagnosis of polysubstance

dependence was "due to the claimant's history of dependence on and abuse of alcohol and marijuana usually taken voluntarily for the purpose of  their effect on the central nervous system or to prevent or reduce withdrawal symptoms" and that "the claimant's history is extensive for use since age eleven until age thirty-six." (Tr. at 333).   Mr. Vecchio opined that Claimant's prognosis was poor, and that her social functioning was "within normal limits though this claimant's tendency to be self-conscious inhibits her socially." (*Id.*).

On December 11, 2009, Dr. Holly Cloonan, Ph.D. conducted a psychiatric review technique and a mental residual functional capacity assessment of Claimant. (Tr. at 336-53). In the Psychiatric Review Technique, Dr. Cloonan determined that Claimant had the following medically determinable impairments: borderline intellectual functioning, (Tr. at 337), "bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)," (Tr. at 339), generalized anxiety disorder, (Tr. at 341), personality disorder, not otherwise specified, (Tr. at 343), and polysubstance dependence, not otherwise specified (Tr. at 344). Based upon these impairments, Dr. Cloonan opined mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. at 346). Dr. Cloonan also found no episodes of decompensation. (*Id.*). Dr. Cloonan observed that Claimant "appears mostly credible with exception there are contradictions in her reporting of her substance abuse and vocational history across two consultative examinations." (Tr. at 348). Specifically, Dr. Cloonan observed contradictions in Claimant's reports to Ms. Tate and Mr. Vecchio with respect to the last date she worked and her history of substance abuse, treatment, or

related arrests. (*Id.*). Dr. Cloonan also stated that Claimant's "diagnosis of mild mental retardation is not supported by the claimant's work history," and observed that "the current consultative examining source described her as presenting as low functioning but it appears likely that intellectual functioning is in the borderline intellectual functioning [rather than] mild mental retardation." (*Id.*).

In her Mental RFC Assessment, (Tr. at 350-52), Dr. Cloonan opined that Claimant was not significantly limited in her abilities to: remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (Tr. at 350-51). Dr. Cloonan opined that Claimant was moderately limited in her abilities to: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.

(Tr. at 351). Dr. Cloonan further elaborated that Claimant "receives treatment and her boyfriend stated to the [consultative examining] source that she is making progress in the past 3 months." (Tr. at 352). Accordingly, Dr. Cloonan concluded that Claimant "is able to learn and perform uncomplicated work-like activities in a setting with limited interactions with others due to her reported nervous, submissive demeanor." (*Id.*).

On February 19, 2010, state consultant Dr. Drew. C. Apgar, J.D., D.O., F.C.L.M. completed an evaluation of Claimant that consisted primarily of a physical examination, but also included relevant observations regarding Claimant's mental status. (Tr. at 377-93). Claimant reported a history of anxiety, depression, and bipolar disorder, but denied any history of alcohol use. (Tr. at 378-79). After completing a thorough physical examination of Claimant, he determined that her "mental status was essentially normal," (Tr. at 388), based upon his observations that Claimant was "friendly, cooperative and forthcoming"; her interests were not constricted; she demonstrated an awareness of the events of the world; displayed concern for maintaining current relationships which are supportive; demonstrated good hygiene and made an effort at appropriate appearance; and demonstrated an awareness of means and willingness to improve her circumstances. (*Id.*). Dr. Apgar also observed that Claimant's "understanding and memory (long term and short term) were intact," she was able to maintain concentration and focus throughout the exam, and her interaction and adaptation were appropriate for the exam. (*Id.*).

On February 26, 2010, Dr. Rosemary L. Smith, Psy.D. completed a second Psychiatric Review Technique and mental residual functional capacity assessment. (Tr. at 394-410). In the Psychiatric Review Technique, Dr. Smith determined that Claimant had the following medically determinable impairments: "bipolar syndrome with a

history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)," (Tr. at 397); generalized persistent anxiety accompanied by motor tension, autonomic hyperactivity, and apprehensive expectation, (Tr. at 399); and substance abuse. (Tr. at 402). Based upon these impairments, Dr. Smith opined mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. at 404). Dr. Smith found no episodes of decompensation. (*Id.*). Dr. Smith observed that "in the AFR form, the claimant alleged problems in all mental areas and appears partially credible as supported by the consultative evaluation." (Tr. at 406).

Dr. Smith's mental RFC assessment was nearly identical to that of Dr. Cloonan's, (Tr. at 408-11). Dr. Smith only differed in her opinion that Claimant was not significantly limited in her "ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and lengths of rest periods," (Tr. at 409), whereas Dr. Cloonan had opined that Claimant was moderately limited in this respect. (Tr. at 351). However, Dr. Smith likewise concluded that Claimant "retain[s] the ability to learn and perform simple, unskilled work-like activities in an environment that involves limited contact with others." (Tr. at 410).

On May 16, 2011, Dr. Stuart Gitlow, M.D., M.P.H., M.B.A., who specializes in "General, Addiction, and Forensic Psychiatry," reviewed Claimant's mental health records and completed a Medical Assessment of Ability to Do Work-Related Activities (Mental). (Tr. at 229-33). Dr. Gitlow observed that although "Claimant acknowledged heavy alcohol use for years as well as an unspecified amount of marijuana use" in her

19

November 2009 evaluation with Mr. Vecchio, "there are no objective tests in the record such as urine drug tests to support or refute the Claimant's description of use, so we have no way of knowing whether use ended at the time the Claimant said it ended." (Tr. at 229). Dr. Gitlow did however note that Claimant's "records indicat[e] that after 11/17/2009, when the Claimant indicated that all use had stopped, the Claimant's overall mental status improved." (Tr. at 230). Dr. Gitlow opined that "a diagnosis of bipolar disorder is unlikely" given Claimant's lack of reported manic or hypomanic episodes, and that Claimant's work history was inconsistent with the usual functional deficits associated with mild mental retardation. (*Id.*). However, Dr. Gitlow opined that "a substance use disorder is likely to be present" due to Claimant's statements to Mr. Vecchio, despite his concern that "there are no clinical correlates present (objective findings), so this cannot be ruled in or out." (*Id.*). Dr. Gitlow also asserted that Ms. Arthur's March 2011 opinions of Claimant's limitations "are not supported by the rest of the records." (*Id.*).

With respect to Claimant's ability to make occupational adjustments, Dr. Gitlow opined that Claimant had good ability to follow work rules and use judgment; and fair ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently, and maintain attention/concentration. (Tr. at 231). With respect to Claimant's ability to make performance adjustments, Dr. Gitlow opined that Claimant had good ability to understand, remember and carry out simple job instructions; fair ability to understand, remember and carry out detailed, but not complex job instructions; and poor ability to understand, remember and carry out complex job instructions. (Tr. at 232). With respect to Claimant's ability to make personal/social adjustments, Dr. Gitlow opined that Claimant had good ability to

maintain personal appearance; and fair ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (*Id.*).

###    C.    Treatment Records of April Baisden, M.D.

Around July or August 2009, Claimant began psychiatric treatment with Dr. April Baisden, M.D. at Valley Health. (Tr. at 428, 431). Treatment notes confirm that Dr. Baisden diagnosed Claimant with bipolar disorder and prescribed Depakote. (Tr. at 428).

On October 7, 2009, Dr. Baisden observed that Claimant was casually dressed, well-groomed, friendly, and cooperative; her speech was normal; thought process was linear and logical; mood was good; affect was broad and reactive; she denied hallucinations, delusions and suicidal/homicidal ideations; and her insight and judgment were good. (Tr. at 376). Dr. Baisden assessed Claimant with "bipolar disorder, type 1, mixed, without psychosis," and adjusted her medication dosages.  (*Id.*).

On November 18, 2009, Dr. Baisden's observations of Claimant's mental status were largely the same as the month prior. (Tr. at 373). Although Claimant reported that her mood was "everywhere," Dr. Baisden observed that she "actually appeare[ed] a bit calmer in the office than she ha[d] in the past." (*Id.*). Dr. Baisden again adjusted Claimant's medication dosages. (*Id.*).

On December 16, 2009, Claimant reported to Dr. Baisden that "she is feeling some better sleeping some with her medicines *[sic]*," that "her irritability is fairly well controlled," and that "the depression is controlled, and her anxiety is better." (Tr. at 372). Dr. Baisden's observations of Claimant's mental status were again similar to the prior months, (*Id.*), except that she noted Claimant's mood was "pretty good." (*Id.*).  Dr. Baisden assessed Claimant with bipolar disorder, as well as anxiety disorder, not

21

otherwise specified. (Tr. at 372). Dr. Baisden further adjusted Claimant's medication dosages, as part of her plan to "try[] to taper the Depakote off." (*Id.*).

Progress notes from Dr. Baisden document that Claimant discontinued Depakote in February 2010. (Tr. at 359, 449). Claimant's Valley Health medication list indicates that she continued to take psychiatric medication with periodic adjustments occurring every one to two months. (Tr. at 531-32).

On October 8, 2010, Claimant reported that she was "doing about the same," though she had some anxiety regarding her children, over whom she was still seeking custody. (Tr. at 541). Dr. Baisden's observations of Claimant's mental status were similar to prior evaluations, except that her mood was down and her affect was dysphoric, but still reactive and appropriate. (*Id.*). Dr. Baisden assessed Claimant with bipolar disorder, type 2 and anxiety disorder, not otherwise specified, and made a slight adjustment to one of her medication dosages. (*Id.*).

On January 5, 2011, Claimant reported continued problems with anxiety and her mood, and that she had been denied visitation rights with her children. (Tr. at 538). Claimant reported feeling hopeless, but denied any suicidal thoughts. (*Id.*). She also denied using drugs or alcohol. (*Id.*). Dr. Baisden observed that Claimant was casually dressed, well groomed, and had good eye contact; she was friendly and cooperative, but tearful; her speech was normal; her thought process was logical and linear; her mood was down; her affect was dysphoric, reactive, and appropriate; she denied hallucinations, delusions, and suicidal/homicidal ideations; and her insight and judgment were fair. (Tr. at 539). Dr. Baisden made minor adjustments to Claimant's medications and scheduled another appointment for six weeks later. (*Id.*).

On February 16, 2011, Claimant reported that her mood continued to be irritable and she had difficulty sleeping. (Tr. at 537). Aside from describing Claimant's mood as irritable, Dr. Baisden's observations of her mental status were unremarkable. Claimant was casually dressed and cooperative, with fair eye contact; her speech was normal; thought process was logical and linear; affect was broad and reactive; she denied hallucinations, delusions, and suicidal/homicidal ideations; and her insight was fair. (*Id.*).

## VI.   Scope of Review

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990). The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001)). If substantial evidence exists, then the Court must affirm the Commissioner's decision

"even should the court disagree with such decision." *Blalock,* 483 F.2d at 775*.*

## VII.   <u>Analysis</u>

Claimant argues that the ALJ "erred in failing to address all of the medical opinions in the file," particularly Ms. Arthur's May 2010 psychological evaluation. (ECF No. 10 at 7-8). In support of her argument, Claimant highlights two instances in the decision in which the ALJ referred to Ms. Arthur's February 2009 psychological evaluation without similarly addressing her May 2010 evaluation. Additionally, Claimant objects to the ALJ's discussion of Ms. Arthur's March 2011 RFC opinion on grounds that "he appears to mention the limitations checked off by Ms. Arthur on the form dated March 29, 2011 but does not address the written comments." (*Id.* at 8). Having thoroughly considered the evidence and the arguments of counsel, the undersigned rejects Claimant's challenges as lacking merit. Additionally, the undersigned **FINDS** that the decision of the Commissioner is supported by substantial evidence and should be affirmed.

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. §§ 404.1527(b), 416.927(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* §§ 404.1527(a)(2), 416.927(a)(2). If conflicting medical opinions are present in the record, the ALJ must resolve the conflicts by weighing the medical source statements and providing an appropriate rationale for accepting, discounting, or rejecting the opinions.

*See Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995).

In general, the ALJ will give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1). Even greater weight will be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* §§ 404.1527(c)(2), 416.927(c)(2). However, the ALJ must analyze and weigh all medical source opinions in the record, including those of non-examining sources. 20 C.F.R. §§ 404.1527(e), 416.927(e). Relevant factors include: (1) length of the treatment relationship and frequency of evaluation; (2) nature and extent of the treatment relationship, (3) degree to which an opinion is supported by relevant evidence and explanations; (4) consistency of an opinion with the record as a whole, (5) whether the source is a specialist in the area relating to the rendered opinion; and (6) any other factors which tend to support or contradict the opinion, including "the extent to which an acceptable medical source is familiar with the other information in [a claimant's] case record. 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6).

When the opinions of agency experts are considered, the ALJ "must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist as the [ALJ] must do for any opinions from treating sources, non-treating sources, and other non-examining sources." 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2). Ultimately, it is the responsibility of the ALJ, rather than the court, to evaluate the case, make findings of fact, resolve conflicts of evidence, *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990), and provide good reasons in the written decision for the weight given to the opinions. *Id.* §§

404.1527(e)(2)(ii), 416.927(e)(2)(ii).

A minimal level of articulation of the ALJ's assessment of the evidence is "essential for meaningful appellate review," given that "when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" *Zblewski v. Schweiker,* 732 F.2d 75, 79 (7th Cir. 1984) (citing *Cotter v. Harris,* 642 F.2d. 700, 705 (3rd Cir. 1981)). Nonetheless, while the ALJ is required to consider all of the evidence submitted on behalf of a claimant, "[t]he ALJ is not required to discuss all evidence in the record." *Aytch v. Astrue,* 686 F.Supp.2d 590, 602 (E.D.N.C.2010); *see also Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir.2005) (explaining there "is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision"). Indeed, "[t]o require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's ... alleged condition[s] would create an impracticable standard for agency review, and one out of keeping with the law of this circuit." *White v. Astrue,* 2009 WL 2135081, at *4 (E.D.N.C. July 15, 2009).

In the instant case, it is clear that the ALJ considered and weighed the various medical source opinions, including Ms. Arthur's, and adequately articulated his rationale for accepting or discounting them. Contrary to Claimant's contention, the ALJ did in fact review Ms. Arthur's May 2010 evaluation, as he cited directly to the evaluation when assessing Claimant's social functioning and again when addressing Dr. Gitlow's summary of the records. (Tr. at 19, 24). Although the ALJ did not regurgitate *verbatim* Ms. Arthur's 2010 findings and conclusions, such an exercise was unnecessary as the findings and conclusions were essentially the same as those recorded during her 2009 evaluation, which the ALJ did summarize in detail. *See Yuengal v. Astrue*, No.

4:10-CV-42-FL, 2010 WL 5589102, at *9 n.9 (E.D.N.C. Dec. 17, 2010) (finding harmless error where ALJ failed to discuss an opinion of one doctor that was identical to another doctor's opinion). In both evaluations, Claimant reported similar symptoms of depression, anxiety, and panic attacks and failed to reveal her long-term history of substance abuse. (Tr. at 237-38, 241-42). Likewise, in both mental status examinations Claimant's appearance, attitude/behavior, social interaction, speech, orientation, thought processes, thought content, perceptual experiences, insight, psychomotor activity appeared to be within normal limits or otherwise unremarkable; she reported no suicidal or homicidal ideations; and her judgment and concentration were only mildly deficient. (Tr. at 238-39, 243). Even though Claimant's BDI-II and BAI scores corresponded with "severe" ranges of depression and anxiety in both evaluations, (Tr. at 239, 245), Ms. Arthur actually observed an improvement in Claimant's mood and affect in May 2010, as Claimant's "mood was appropriate to situation" and "affect was normal," whereas both were "somewhat restricted" in February 2009. (Tr. at 238, 243). Accordingly, in May 2010, Ms. Arthur diagnosed Claimant with major depressive disorder, single episode-*mild* and assigned a GAF score of 49, (Tr. at 243) (emphasis added), an improvement from her February 2009 evaluation, in which she diagnosed Claimant with major depressive disorder, single episode-*moderate*, and assigned a GAF score of 45. (Tr. at 239-40) (emphasis added). At any rate, Ms. Arthur's respective February 2009 and May 2010 diagnoses of depression, anxiety, and social phobia, (Tr. at 236, 243), are consistent with the ALJ's finding that "the claimant continues to suffer from anxiety, depression, and bipolar disorder, although her symptoms are more severe if she is abusing drugs and alcohol." (Tr. at 23). Ms. Arthur noted an apparent decline in Claimant's immediate, recent, and remote memory in May 2010, (Tr. at 239, 243);

however, this observation was inconsistent with findings by Mr. Vecchio in November 2009 and by Dr. Apgar in February 2010. (Tr. at 24, 330, 388). Moreover, the ALJ pointed out that the most recent psychological evaluation performed in February 2011 by Claimant's treating physician, Dr. Baisdan, reflected a normal mental status examination except for irritation. (Tr. at 23). Reconciling these opinions, the ALJ determined that "Claimant would have a mild limitation [in concentration, persistence or pace] if the substance use were stopped." (Tr. at 24).

Claimant contends that by ignoring Ms. Arthur's 2010 evaluation, the ALJ failed to appreciate its significance. (ECF No. 10 at 8). In Claimant's view, the very similarity of the 2010 findings to the 2009 findings is crucial because it demonstrates that no appreciable improvement occurred in Claimant's psychological condition even though "by this time she had been sober since August 2009." (*Id.* at 7). The record reflects, however, that the ALJ did recognize and consider Claimant's position, but concluded that the reliability of Ms. Arthur's findings were undermined by Claimant's failure to be honest with Ms. Arthur about her long history of substance abuse. (Tr. at 238, 242). Indeed, the ALJ took particular issue with the fact that Claimant "did not mention her alcoholism or drug abuse" in February 2009, when she "was still using at the time." (Tr. at 26). In addition, the ALJ clearly explained his rationale for discounting Ms. Arthur's opinions, stating: 1) "The claimant never revealed to Ms. Arthur her past substance abuse; so that Ms. Arthur could make a valid diagnosis," in either February 2009 or in May 2010. (Tr. at 19); and 2) Ms. Arthur's opinion "does not correlate with the claimant having non-severe mental impairments," as substantial evidence on the record demonstrates. (Tr. at 26).

Finally, Claimant argues that the ALJ should have addressed the written comments that Ms. Arthur included in her mental RFC opinion. "The issue is not whether the ALJ failed to mention a particular piece of evidence in their decision, but whether the ALJ's final decision denying benefits is supported by substantial evidence contained in the Administrative Record." *Reynolds v. Astrue*, 2012 WL 748668, at \*2 (W.D.N.C. Mar. 8, 2012). As stated above, the ALJ rejected a portion of Ms. Arthur's RFC opinion because she was not fully informed of Claimant's substance abuse history and because her opinion was inconsistent with Claimant's other evaluations and treatment records. (Tr. at 26). Substantial evidence on the record supports the ALJ's assessment of Claimant's mental limitations. (Tr. at 23-25).

The ALJ determined that "when the claimant is on psychotropic medication and not abusing drugs and alcohol, the claimant's anxiety, depression and bipolar disorder are non-severe impairments," (Tr. at 23), based upon his assessment of Claimant's mild limitations in activities of daily living; social functioning; and concentration, persistence or pace, were her substance use to cease. (Tr. at 24-25). In reaching this conclusion, the ALJ accorded "great weight to Dr. Gitlow who analyzed the claimant's medical file and opined that without alcohol and drug dependence and on mood stabilizing medication, the claimant is generally noted to have normal mental status findings and or irritability with low mood." (Tr. at 25). Considering the factors set out in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6)d, the ALJ was entirely justified in giving more weight to the RFC opinion of Dr. Gitlow than that of Ms. Arthur. Dr. Gitlow's curriculum vitae indicates that he is a well-trained psychiatrist with an M.D., an M.P.H. and an M.B.A. (Tr. at 547-58). He has practiced psychiatry since 1988, taught at prestigious institutions including Harvard Medical School, and is certified in addiction psychiatry

by the American Board of Psychiatry and Neurology. (Tr. at 233, 547-48). Although he did not personally examine Claimant, Dr. Gitlow had access to a detailed and longitudinal picture of Claimant's mental health history because the ALJ provided him with Claimant's treatment and evaluation records. (Tr. at 19). Moreover, Dr. Gitlow's mental RFC opinion was supplemented by a letter to the ALJ, which included a thoughtful discussion of the relevant records and how they related to each other. (Tr. at 229-33). Finally, Dr. Gitlow's conclusions were supported by the presence or particular absence of medical findings and were consistent with other mental health opinions.

In contrast, Ms. Arthur is a master's degree level psychologist without any reported subspecialization. (Tr. at 525). Ms. Arthur was not a treating health care provider, nor did she examine Claimant for purposes of determining disability under the provisions of the Social Security Act. Ms. Arthur did not review or analyze Claimant's past mental health records and, instead, reached her conclusions, at least in part, upon the incomplete and misleading information provided by Claimant regarding her history of drug and alcohol abuse.[3] (Tr. at 237-45). Likewise, although Ms. Arthur supplemented the mental RFC checklist with one or two sentences per each broad category of mental functionality, these statements were unsupported by reference to objective testing or examination and appear to be largely based upon Claimant's subjective reports. (Tr. at 523-24).

---

[3] Further, the undersigned notes that in February 2009, Ms. Arthur assigned Claimant a GAF score of 45. (Tr. at 240). In contrast, only one month earlier, Claimant's treating therapist assigned Claimant a GAF score of 60, which reflects significantly less psychological impairment. (Tr. at 477). Although certainly not dispositive, this considerable discrepancy underscores the ALJ's concern that some of Ms. Arthur's opinions were unreliable due to her relative lack of information regarding Claimant's mental health and substance abuse history.

When reviewing the record as a whole, the ALJ's RFC findings and his determination regarding the impact of Claimant's substance abuse are consistent with the mental RFC opinions of Dr. Cloonan and Dr. Smith, as well as the clinical evaluations of Dr. Apgar and Mr. Vecchio and the treatment notes of Dr. Baisden, Claimant's psychiatric treatment provider. Both Dr. Cloonan and Dr. Smith opined that Claimant was able to learn and perform simple work-like activities with limited interaction with others, (Tr. at 352, 410), based upon their respective determinations that Claimant was not significantly limited in her ability to work, except for some moderate limitations with respect to detailed instructions; extended concentration, persistence, and pace; social interaction with the public and supervisors; and responding to changes in the work setting. (Tr. at 350-51, 408-09). Mr. Vecchio similarly found mild limitations with respect to Claimant's memory, concentration, persistence, and pace,(Tr. at 330) and opined that her social functioning was "within normal limits though [her] tendency to be self-conscious inhibits her socially." (Tr. at 333). Dr. Apgar's observations of Claimant's adequate understanding and memory; concentration and focus; and interaction and adaptation, further support the ALJ's assessment. (Tr. at 388). Finally, Dr. Baisden's mental status examinations, which began after Claimant's substance use ceased, reflect that Claimant's mental impairments were well-controlled with psychiatric medications. (Tr. at 372-76, 531-41). Accordingly, the ALJ's conclusion that Ms. Arthur's RFC opinion "is too restrictive" and "does not correlate" with the other opinions is valid. (Tr. at 26).

The ALJ provided a thorough overview of the record as it pertains to Claimant's mental health treatment and evaluations, carefully weighed the opinions against the evidence on record, and sufficiently articulated legitimate reasons for discounting a

portion of Ms. Arthur's opinions. To the extent that Ms. Arthur's opinions were consistent with other records in the file, the ALJ adopted them. When Ms. Arthur's opinions were in conflict with those of Dr. Gitlow and others, the ALJ choose to discount or reject Ms. Arthur's, which is a matter well within his discretion. Thus, the ALJ abided by the applicable regulations and rulings in giving greater weight to the opinions offered by Dr. Gitlow. Therefore, the undersigned **FINDS** that the ALJ did not err in his evaluation of Claimant's applications for benefits and substantial evidence exists in the record to support the ALJ's findings.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Defendant's Motion for Judgment on the Pleadings (ECF No. 11), **DENY** Plaintiff's Motion for Judgment on the Pleading, (ECF No. 10), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations " to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District

Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:**  February 11, 2013.

Cheryl A. Eifert
United States Magistrate Judge